Filed 4/8/22  In re M.R. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re M.R., a Person Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> M.P., <br><br> Defendant and Appellant. | E077265 <br><br> (Super.Ct.No. J279746) <br><br> OPINION |

APPEAL from the Superior Court of San Bernardino County.  Christopher B. Marshall, Judge.  Affirmed.

Cristina Gabrielidis, under appointment by the Court of Appeal, for Defendant and Appellant.

Steven O'Neill, Interim County Counsel, and Svetlana Kauper, Deputy County Counsel, for Plaintiff and Respondent.

1

## INTRODUCTION

Appellant M.P. (father) appeals from a juvenile court's order terminating visits with his daughter, M.R. (the child). He argues the evidence was insufficient to support the court's finding that visits with him were detrimental. We affirm.

## FACTUAL AND PROCEDURAL HISTORY

On February 13, 2019, the San Bernardino County Children and Family Services (CFS) filed a Welfare and Institutions Code[1] section 300 petition on behalf of the child, who was 23 months old at the time. The petition alleged that the child came within the provisions of section 300, subdivisions (b) (failure to protect) and (j) (abuse of sibling). The petition included the allegations that the child's mother, M.C. (mother),[2] had a substance abuse problem, a criminal history, a history of mental health symptoms, and that she engaged in domestic violence in front of the child, used inappropriate discipline, and abused the child's sibling. The petition alleged that father knew or reasonably should have known about mother's issues, and his ability to provide and care for the child was in question.

The social worker filed a detention report and stated that CFS received a referral alleging general neglect, and physical and emotional abuse of the child and her siblings.[3]

---

[1] All further statutory references will be to the Welfare and Institutions Code section unless otherwise indicated.

[2] Mother is not a party to this appeal.

[3] The child's siblings are not subjects of this appeal.

The referral alleged, in part, that mother was in and out of the home abusing drugs, that her boyfriend threatened to kill her and the maternal grandmother, and that mother grabbed the child and body-slammed her onto the couch and dragged her on the floor.

The court held a detention hearing on February 14, 2019, and detained the child in foster care. It ordered supervised visits once a week.

*Jurisdiction/Disposition*

The social worker filed a jurisdiction/disposition report on March 6, 2019, and recommended that the court sustain the petition, remove the child from the custody of father and mother (the parents), and provide reunification services to both parents. Mother and father were not married but dated on and off for two years. The social worker interviewed father, who said he may or may not be the child's father, since mother said another man might be the father. Father stated that he did not sign the child's birth certificate. Nevertheless, he now held the child out as his own and provided items such as diapers and wipes, when mother requested them. Father stated that he was never alone with the child, as others were always present. He reported that he has not cared for a small child, and the social worker confirmed that he needed guidance in changing the child's diaper and in interacting with her.

On March 7, 2019, both parents filed a waiver of rights form stating that they were submitting on the allegations in the petition. The court held a jurisdiction/disposition hearing that day and sustained the petition. The court authorized father to have unsupervised visits with the child, as appropriate. It set the matter contested on behalf of mother and continued the matter for a contested disposition hearing.

3

The court held a contested disposition hearing on April 16, 2019, and mother named another potential father of the child. The court continued the hearing so the matter could be investigated.

On April 17, 2019, the social worker filed additional information for the court and reported that father was enrolled in a parenting course and was having weekly supervised visits. Father said he previously agreed to have visits with mother so he could give her a ride. However, he now wanted to have visits with the child alone. CFS was concerned with father having unsupervised visits with the child and wanted to wait until he could demonstrate his ability to independently care for her daily needs and show that he was a protective parent.

On June 10, 2019, the court declared the child a dependent of the court and removed her from the parents' custody. The court found father to be a presumed father and ordered reunification services for him and mother.[4] Father's case plan required him to participate in a parenting education program, and the court amended the plan to include Parent Child Interaction Therapy (PCIT). It also ordered supervised visits once a week and authorized unsupervised visits once a week, as well as overnight visits and weekends, when appropriate.

---

[4] The court found the other potential father named by mother to be an alleged father.

*Six-month Status Review*

The social worker filed a six-month status review report on December 4, 2019, and reported that father completed his parenting class and was currently attending PCIT with the child.

As to visits, the social worker reported that father was consistently visiting; however, the quality of the visits was lacking. The caregivers, who supervised the visits, reported that he did not engage in conversation with the child and did not check that her basic needs were met (e.g., he did not check for wet diapers or bring snacks to the visits). Father would also spend a lot of time on his phone during the visits. The child reportedly showed familiarity with him but did not seek him for comfort.

The social worker reported that the child had a limited vocabulary that was improving. The foster mother stated that the child would have tantrums where she got very angry and would throw things. The tantrums were mostly triggered when she did not get what she wanted. The child was being treated with therapy for tantrums and delayed speech. She was also receiving therapy in the home to address night terrors that caused her to wake up at night crying.

The court held a six-month review hearing on December 10, 2019, and continued father's services. The court granted CFS authority to allow him unsupervised visits upon his completion of PCIT.

On January 30, 2020, the court had a non-appearance review hearing. The minute order stated that open case investigations received a referral on January 9, 2020, alleging the child was sexually abused by an unknown perpetrator. The minute order noted that

5

when the child was first placed in March 2019, the caregiver noticed vaginal abnormalities and took her to a pediatrician. The pediatrician observed abnormalities and referred her to a specialist, but she did not see one due to insurance issues. Thus, CFS recommended and the court authorized the Children's Assessment Center (CAC) to perform a medical exam of the child. Based on the examination, the referral was deemed unfounded.

*Twelve-month Status Review*

The social worker filed a 12-month status review report on May 8, 2020, and recommended that father's services be continued. He continued to have consistent visits with the child, and the quality of the visits had improved. The social worker observed that his interactions were appropriate and advised the caregiver to allow him to provide all the care for the child during visits. Nonetheless, the caregiver continually intervened in the care of the child. Consequently, father was not able to fully display his parenting skills. Thus, the social worker recommended unsupervised visits for 6 hours, once a week.

On May 15, 2020, the court continued father's services and ordered visitation between him and the child to be unsupervised, once a week for six hours, and it granted CFS authority to increase his visits to overnights and weekends.

*Eighteen-month Status Review*

The social worker filed an 18-month status review report on September 24, 2020, and recommended that the child be returned to father's custody under a plan of family maintenance. Visits with father were consistent and appropriate, and the social worker

6

had increased the visits to 10 hours of unsupervised time. The social worker opined that father had gained some benefit from the services he completed, but needed the experience of being responsible for the day-to-day care of the child to tell if he was able to parent the child effectively.

Subsequently, at the hearing on October 7, 2020, county counsel advised the court of a sexual abuse allegation of the child by father and requested time to investigate the referral. The court continued the matter and reverted visits to being supervised, once a week for two hours.

*Section 342 Petition*

On December 21, 2020, the social worker filed a section 342 petition, alleging that the child came within the provision of section 300, subdivisions (b) (failure to protect) and (d) (sexual abuse). The petition alleged that, on or about September 25, 2020, the child disclosed that father sexually abused her.

In a detention report, the social worker reported that she spoke with the child on October 14, 2020, and the child said she liked her visits with father and there was nothing that scared or hurt her. However, the child then said he "touched my private part." She said it happened in the bathroom "a lot of times" and he touched her with his fingers. The child was able to identify her private parts by pointing to them. When the social worker asked if father was helping her in the bathroom, she said "no." The child did not identify anyone else touching her inappropriately. The social worker noted there were sentences the child spoke that neither she nor anyone else in the home was able to understand.

7

The social worker reported that the child's foster mother was worried that the child was still having contact with her father, even though she did not want to visit him. The foster mother said the child cried and had to be convinced to go to visits. She also said that, prior to the sexual abuse disclosure, she found the child putting stuffed animals and also a toy flute in her vagina and rubbing her private parts on them. The foster mother was advised by the child's therapist and others that this may be "normal play or self-exploration." However, when the child disclosed that father touched her, the foster mother became more concerned. The foster mother said other things, like the child acting out after her visits, made her worry.

On November 13, 2020, the child had a forensic medical exam at the CAC. The results of the anal/genital exam were normal, which meant the examiner could "neither confirm nor negate sexual abuse."

On November 19, 2020, the social worker spoke with father, and he denied the allegations. Father's response was, "I knew from the beginning that [the foster parents] were going to set me up, so I always stayed away from anything that involved me being in the bathroom." He reported that he never helped the child wipe "down there" and was never present in the bathroom when she needed to go. He said, "I knew this was going to happen, they don't like me, they are racist they are trying to frame me." Father was adamant that the foster mother was coaching the child and said she "just wants to keep my daughter for the money." Father denied the child ever acted out sexually or played inappropriately with her stuffed animals. When the social worker asked him how he felt

about taking a lie detector test, father said, "No I will never do that, I know those things are set up for people to flunk them."

On December 9, 2020, the child went to the CAC for a forensic interview, which the social worker and a detective observed. The child was playful and interacted well, and the interviewer noted that she was verbal for her age but was still developing her verbal skills. The child initially denied any touching, but later disclosed that "her friend [father]" touched her with his finger, and she pointed to "the part where pee pee comes from." The child said it happened in the bathroom and on the couch, and that it happened "a lot." She stated, "It felt so bad." She also said she did not like visits with father. Furthermore, the child told the interviewer that no one helped her go to the restroom at father's house, but her sister helped her go to the bathroom at her foster home.

On December 16, 2020, the social worker spoke with the babysitter for the foster mother. The babysitter reported that during a normal bedtime routine, which consisted of using the restroom and changing into pajamas, the child would not allow her to help her clean up after using the restroom. The child said, "It hurts." The babysitter asked why.it was hurting her and if someone hurt her. The child said father hurt her and then proceeded to show her how. The child took her finger and put it by her vagina and began moving side to side. The babysitter noted that the child had visited father the day prior to making this disclosure.

On December 16, 2020, the social worker spoke to father regarding the outcome of the CAC medical and forensic interview. Father was upset and repeated multiple times that the child was being coached by the foster mother. The social worker informed

9

him that the child was asked during the forensic interview if anyone told her what to say, and the child said "no."

On December 22, 2020, the court held a detention hearing and changed father's visits to supervised, based on the new allegations. It then set the matter for a jurisdiction/disposition hearing.

*Jurisdiction/Disposition*

The social worker filed a jurisdiction/disposition report on January 15, 2021, and recommended that the court sustain the petition, not provide reunification services to father or mother, and set a section 366.26 hearing with adoption as the permanent plan. The social worker reported that the child had consistently disclosed the same details of the sexual abuse multiple times, over a period of time. Father continued to deny the allegations. Based on the social worker's experience and training, she opined that the likelihood of a child that age maintaining such detail, without having experienced abuse, was low. In addition, the social worker observed that the child referred to father only as a friend. She further noted that the child expressed to both her and the caregiver that she did not want to attend visits with father.

The court held a hearing on January 19, 2021. It found the allegations true and sustained the section 342 petition.

The court held a combined contested section 366.22 hearing and contested disposition on the supplemental petition on February 18, 2021. County counsel informed the court that father no longer thought he was the child's biological father, and he was willing to "walk away." She argued that, while father had participated in his services, he

did not benefit from them, since he sexually abused the child during his visits. Furthermore, father was out of time, since they were at the 18-month hearing. Thus, county counsel asked the court to terminate his services and set a section 366.26 hearing. Father asked the court to return the child to him on family maintenance. The court noted that it had previously found the sexual abuse allegations true. It then found that return of the child to father's custody would be detrimental to the child's well-being. The court terminated reunification services and set a section 366. 26 hearing. It also ordered visitation to be once a month, supervised.

*Section 366.26*

The social worker filed a section 366.26 report on June 3, 2021. She reported that father was having visits at the CFS office and his interactions and engagement with the child were appropriate. However, at the March 25, 2021 visit, while awaiting father's arrival, the child told the social worker she did not want to visit. When asked why, she said because he touched her. The social worker advised the child that she would be there throughout the visit to ensure she was safe, and the child smiled and agreed to visit. When the child initially saw father, she took a step back and said, "Don't touch me." The social worker indicated the child had not seen father in some time, and the child's therapist had identified that statement as a tool the child could use if she felt uncomfortable. The social worker reported that the child was timid throughout the visit and took some time to warm up to father.

The social worker further reported that the child looked outside the window throughout the entire visit on April 29, 2021. The child also had an attitude, as evidenced

11

by her being uncooperative with father, defying rules, and not listening. Further, she was not interested in activities with him, and she threw items on the floor on purpose. Fifteen minutes before the visit was to end, the child said she wanted to go home.

The social worker reported that the child lost interest easily at visits and was hard to engage, and she appeared to be conflicted with regard to wanting to engage with father at visits. The social worker noted that the child continued to be consistent in her disclosure regarding the sexual abuse. Furthermore, despite her young age, the child was able to articulate her wants and needs, and she expressed verbally and with her body language that she did not want to participate in visitation. Thus, the social worker recommended that visitation with father be deemed detrimental to the child's well-being, due to the ongoing trauma of exposure to him.

The social worker spoke with the child's assigned therapists, and they reported that the child continually stated she did not want to have visits with father, and she cried about visits and questioned why she had to attend. The social worker asked for a report regarding behaviors identified in therapy. The child's current assigned therapist submitted a report dated May 20, 2021. As to the child's presenting issues, the report stated: "Client is experiencing significant deterioration to overall functioning following reports of abuse by alleged father. The client appears to be triggered due to continued exposure to trauma when visiting with alleged father. Client is withdrawing from others when experiencing anger and sadness as she questions and cries about her continued visitations with the alleged father. Client has a loss of pleasure in things she once enjoyed due to constant feelings of being ignored when asking for visits to stop. The

client is tearful, has been having incidents of enuresis, recent night terrors, sleep walking, trouble concentrating, and wringing fingers and hands." The therapist opined that the child could attain the therapeutic goals by discontinuing visitation, and consistently implementing strategies and skills, with additional family support.

On June 17, 2021, the social worker recommended that father's reunification services be terminated and that the permanent plan be changed from adoption to legal guardianship with the current caregivers.

The parties stipulated to a waiver of their appearances at the section 366.26 hearing, and the court proceeded to find that visits with father were detrimental, in that they were harmful to the child's emotional and physical well-being. The court continued the hearing to finalize the legal guardianship paperwork.

## DISCUSSION

### The Evidence Was Sufficient to Support the Court's Finding That Visitation Was Detrimental

Father argues there was insufficient evidence that continued visitation, particularly supervised visitation, was detrimental to the child; thus, the court erred when it terminated his visits. We disagree.

A. *Relevant Law*

During the reunification period, the focus of the proceedings is on trying to reunify parents with their children, and denial of visitation during this period is governed by section 362.1, subdivision (a)(1)(B), which provides that a visitation order shall not jeopardize a child's safety. (*In re D.B.* (2013) 217 Cal.App.4th 1080, 1089-1090.)

13

However, visitation during the postreunification period is governed by different statutes which focus on permanency and stability for the child. (*Id.* at p. 1090.) At a section 366.22 hearing, when a court terminates reunification services and sets a section 366.26 hearing, it must continue to permit the parent to visit the child unless it finds that visitation would be detrimental to the child. (§ 366.22, subd. (a)(3).)

"The juvenile court's detriment finding is reviewed under the substantial evidence standard. [Citations.] Substantial evidence 'means evidence that is "reasonable, credible and of solid value; it must actually be substantial proof of the essentials that the law requires in a particular case. [Citation.] In the absence of substantial evidence showing such detriment, the court is required to return the minor to parental custody. [Citation.]" [Citation.]' " (*In re A.J.* (2015) 239 Cal.App.4th 154, 160.)[5]

B. *There Was Sufficient Evidence of Detriment to the Child*

Father specifically contends that he was appropriate during visits, and there was no chance of the child being harmed since the visits were supervised. He further points out that the child had an anxiety disorder, troubling behaviors, a speech delay, and vaginal abnormalities at the beginning of the dependency, and it was unreasonable to now conclude those same behaviors were the result of visits with him. He also asserts the court apparently terminated visits because the child "sometimes stated she did not want to

---

[5] Father asserts there is a split of authority with respect to the correct standard of review to apply when reviewing a court's order terminating visitation. However, we note he proceeds to argue the evidence was insufficient to support the court's finding that visitation was detrimental to the child.

visit." Father continues to deny that he sexually abused the child and maintains that she was "coached and conditioned."

Father's claims simply discount or ignore the evidence supporting the findings that he sexually abused the child and that continuing visitation with him was detrimental to her well-being. He is correct that his visits were consistent, and his interactions during supervised visits were appropriate. We note that, by the time of the 12-month review, the quality of the visits had improved, and on May 15, 2020, the court ordered visitation to be unsupervised, once a week. However, at the hearing on October 7, 2020, county counsel advised the court of the sexual abuse allegation, and the court ordered the visits to be supervised again. Thus, father had approximately five months of unsupervised visits. It was during that time period the child alleged that he inappropriately touched her.

The evidence shows that the child disclosed the allegations to the social worker on October 14, 2020, and said father "touched [her] private part." The child said it happened in the bathroom "a lot of times," and he touched her with his fingers. The child was able to identify her private parts by pointing to them. At that time, the foster mother said the child cried and had to be convinced to go to visits. She also reported that prior to the child's disclosure, she found the child putting stuffed animals and also a toy flute in her vagina and rubbing her private parts on them.

When the child had a forensic interview at the CAC on December 9, 2020, she again disclosed that father touched her with his finger, and she pointed to her private part.

15

She stated it happened in the bathroom and on the couch. The child also said it happened "a lot" and that "it felt so bad." She stated she did not like visits with father.

Furthermore, the evidence shows the babysitter reported that the day after father had a visit with the child, she would not allow the babysitter to help clean her up after using the restroom. The child told the babysitter that father hurt her and proceeded to show how by putting her finger by her vagina and moving it side to side. Based on the social worker's experience and training, she opined that it was unlikely a child that age could maintain such detail, without having experienced abuse. She also noted that the child expressed to her that she did not want to attend visits with father.

After terminating reunification services, the court continued to order supervised visitation, and the evidence showed that the child did not feel comfortable with father when she saw him and had no interest in interacting with him. At the March 25, 2021 visit, the child told the social worker she did not want to visit with father, and when asked why, she again said because he touched her. When the child saw father, she took a step back and said, "Don't touch me," which her therapist had taught her to say if she felt uncomfortable. At the next visit, the child looked outside the window throughout the entire visit. She was uncooperative with father, did not listen, was not interested in participating in activities with him, and purposely threw items on the floor. The child also asked to go home 15 minutes before the visit was to end.

Significantly, the child's therapist recommended that the visits with father be discontinued due to the negative effects on the child. She reported that the child experienced "significant deterioration to overall functioning" following the abuse and

16

that the child appeared "to be triggered due to continued exposure to trauma when visiting with . . . father." The therapist reported that the child questioned and cried about her continued visits with father, and withdrew from others when she experienced anger and sadness over the visits. The therapist further noted that the child constantly felt she was being ignored when she asked for the visits to stop. As a result, she had "a loss of pleasure in things she once enjoyed." The therapist also reported that the child was tearful, and was having "incidents of enuresis, recent night terrors, sleep walking, trouble concentrating, and wringing fingers and hands."[6] The therapist opined that the child could reach her therapeutic goals "by discontinuing visitation."

On this record, we conclude there was more than enough evidence to support the court's finding that the child's visits with father were harmful to her emotional and physical well-being. Accordingly, the court properly found visitation with father detrimental and terminated the visits.

---

[6] We note that these are not the same behaviors the child displayed at the beginning of the dependency, with the exception of the night terrors. Those behaviors included an anxiety disorder, temper tantrums, and a speech delay. Thus, contrary to father's apparent claim, neither the therapist nor the court attributed those early behaviors to visits with him.

DISPOSITION

The order is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

FIELDS _____

Acting P. J.

We concur:

RAPHAEL _____

J.

MENETREZ _____

J.

18